**CAMPBELL SOUP COMPANY,**
Plaintiff,

v.

**SPRINGDALE FARMS, INC., Defendant.**

No. F-71-C-9.

United States District Court,
W. D. Arkansas,
Fayetteville Division.

Feb. 18, 1972.

A. D. McAllister, Jr., of Wade, McAllister, Wade & Burke, Fayetteville, Ark., for plaintiff.

Wayne Harris, of Warner, Warner, Ragon & Smith, Fort Smith, Ark., H. Franklin Waters, of Crouch, Blair, Cypert & Waters, Springdale, Ark., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge.

The plaintiff, Campbell Soup Company, is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in a state other than the State of Arkansas. The defendant, Springdale Farms, Inc., is a corporation organized and existing under the laws of the State of Arkansas with its principal place of business in Springdale, Arkansas. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000.

The plaintiff filed its complaint on March 24, 1971, stating two causes of action seeking to recover damages from defendant as set forth in the complaint.

The first cause of action is based upon a written agreement entered into between the parties on or about April 16, 1969, in which the defendant agreed to perform custom dressing of approximately 180,000 head of tom turkeys at an agreed price.

The agreement provided:

"Custom dressing charged to cover the following:

"Killing

Eviscerating (kidneys to be removed)

Sizing

Packing.

\*     \*     \*     \*     \*

"Only first-class workmanship and material will be accepted, subject to inspection and approval of our quality control department.

"It is also agreeable that one of our personnel observe the killing and eviscerating operation on each lot. All turkeys are to be made ready to cook in the judgment of our inspector."

The plaintiff alleged that the defendant failed to perform as agreed in that 185,696 pounds of the said turkeys de-

livered by the defendant back to the plaintiff were not first-class workmanship and material, and were not ready to cook; that by reason of such failure the 185,696 pounds were unfit for use in food or human consumption and were condemned by the U.S.D.A. inspectors, and that plaintiff has been damaged in the sum of $53,773.66 representing the loss, damages and expenses incurred by reason of the turkeys' unfitness for use in food for human consumption and by reason of the condemnation.

As the second or alternative cause of action, the plaintiff alleged that by reason of the contractual relationship the defendant became charged with the common-law duty to perform the services contracted for with reasonable care, skill and diligence; that the defendant failed to perform with the requisite care, skill and diligence by carelessly and negligently processing the turkeys pursuant to the written agreement and in violation of the U.S.D.A. regulations and pursuant to the Poultry Products Inspection Act of 1957.

Then follows allegations that the defendant in the processing of the turkeys violated Sections 81.49(a), (d), 81.71, 81.73 and 81.95 of Title 7, Code of Federal Regulations. Plaintiff also alleged a violation of 21 U.S.C.A., §§ 459, 463 (a), (b), and 461.

In due time the defendant filed its answer in which it admitted that the plaintiff submitted to it a purchase order, copy of which was attached as Exhibit A to the complaint, and that defendant agreed to perform the custom dressing of approximately 180,000 head of tom turkeys at the price and under the conditions set forth in such purchase order; that the purchase order or agreement provided that only first-class workmanship and material would be accepted subject to the inspection and approval of plaintiff's custom control department, and that the turkeys were to be made ready to cook in the judgment of plaintiff's inspector, and further that the turkeys were to be custom dressed under continuous U.S.D.A. inspection. All other material allegations in the complaint were specifically denied. The defendant affirmatively alleged that the plaintiff not only had a right, but under such agreement had the duty, to inspect and approve the work performed by defendant, and that an agent or employee of the plaintiff, as well as numerous inspectors of the U.S.D.A. did, in fact, inspect and approve the turkeys processed by the defendant.

"  *   *   * that under the terms and conditions of the agreement between the plaintiff and defendant, the defendant was to custom dress the aforesaid turkeys under the direction, control and constant inspection of agents of the plaintiff, and that under such agreement the said plaintiff undertook to control and did control the quality of the work done by the defendant in that a quality control inspector employed by the plaintiff was constantly upon the premises of the defendant, and constantly inspected the processing of the turkeys in question, and that such turkeys were killed, dressed and processed under such direction and control, and to the satisfaction of such employee of the said plaintiff, and that the said plaintiff, after such inspections, accepted the turkeys so processed."

Defendant further pleaded that even if such turkeys were not fit for consumption, the plaintiff failed and neglected to take the actions necessary to mitigate its damages in that it could have and should have discovered the alleged defects in said turkeys at the time the same were processed.

At the beginning of the trial to the court, the plaintiff amended its complaint to reduce the amount prayed for to $53,416.61 and to reduce the number of pounds of turkeys to 184,328 pounds, and to further amend the pleadings by striking any reference to Form PY-505, Nos. A26282, A26284, A26291 and A26292.

There are no allegations of jurisdiction other than as set forth in the

first paragraph of this opinion. The federal statutes involved herein apparently do not specifically vest jurisdiction in the U. S. District Courts, but the court is of the opinion that it has jurisdiction of the controversy by reason of diversity of citizenship of the parties and the amount in controversy.

The case was tried to the court without a jury on January 12 and 13, 1972, and taken under consideration to await submission of briefs, which have been received and considered along with the entire record.

The plaintiff on its brief contends:

"First, that defendant breached the terms and provisions of a contract of bailment entered into by and between plaintiff and defendant; second, that defendant had a common law duty imposed by the terms and provisions of the contract of bailment as well as by the provisions of the Poultry Products Inspection Act of 1957, as amended, and the regulations promulgated thereunder by the U. S. Department of Agriculture."

and that the plaintiff is entitled to recover on either or both causes of action.

On the other hand, the defendant contends that it fully performed the contract in accordance with the terms thereof and the provisions of the applicable statute and the regulations promulgated thereunder.

Before stating the facts as established by the evidence and discussing the contentions of the parties, the court believes that a brief resume of the applicable statutes and various regulations promulgated thereunder would be helpful.

The first and basic act passed by the Congress dealing with the general subject was P.L. 85–172, "Poultry Products Inspection Act," which became effective August 28, 1957. The legislative history of that Act appears in Volume 2, U.S. Code Cong. & Admin.News, 85th Cong., 1st Sess., 1957, pp. 1630–1639, and contains an "explanation" of the bill as reported and passed. Section 2 of the Act contains legislative findings as to the

necessity of the inspection and regulation provided by the Act, "to protect interstate and foreign commerce in poultry and poultry products and authorize the Secretary of Agriculture to designate 'major consuming areas' which shall be within the purview of the statute."

Section 3 declares the congressional policy to provide inspection of poultry and poultry products to prevent the movement in interstate or foreign commerce or designated major consuming areas of unwholesome or adulterated poultry products.

"Section 5(a) requires ante mortem inspection where and to the extent the Secretary deems necessary. Section 5(b) requires a post mortem inspection of each carcass processed in 'official establishments,' those plants processing poultry or poultry products for interstate or foreign commerce or in or for major consuming areas designated under section 4. The Secretary is required to cause to be made some form of examination of the carcass of each bird processed in an 'official establishment'. The committee received testimony to the effect that scientific and technical knowledge presently applied to poultry processing techniques requires some form of examination of each carcass. The Department of Agriculture advises that the carcass of each bird processed is examined under the voluntary inspection program now in effect. The committee in placing this requirement in the bill does so with the direction to the Secretary that he shall at all times provide sufficient inspectors and employ such procedures as will not slow down processing operations in the plants being inspected. This subsection also authorizes reinspection when necessary to determine that wholesomeness has been maintained and quarantine of diseased or contaminated poultry or poultry products to prevent the contamination of healthy poultry or wholesome poultry products."

The Act was amended by P.L. 90–492, "Wholesome Poultry Products Act," ef-

fective August 18, 1968. The legislative history of the amending Act appears in 3 U.S.Code Cong. & Adm.News, 90th Cong., 2d Sess., 1968, pp. 3426–3458. A section-by-section analysis of the amending Act of 1968 appears at pp. 3443–3453.

The Poultry Products Inspection Act of 1957 was not replaced by the amending act, and only minor changes were made therein except that the amending act authorized the establishment of a federal-state cooperative inspection service for poultry products comparable to that provided under the Federal Meat Inspection Act, as amended in 1957.

The applicable statutes as amended appear in 21 U.S.C.A. §§ 451–470.

Title 21, U.S.C.A., § 455, provides:

"(a) [provides for ante mortem inspection.]

"(b) The Secretary, whenever processing operations are being conducted, shall cause to be made by inspectors post mortem inspection of the carcass of each bird processed, and at any time such quarantine, segregation, and reinspection as he deems necessary of poultry and poultry products capable of use as human food in each official establishment processing such poultry or poultry products for commerce otherwise subject to inspection under this chapter."

Sec. 81.71 of 7 C.F.R. provides:

"A post mortem inspection shall be made on a bird-by-bird basis on all poultry eviscerated in an official establishment. No viscera or any part thereof shall be removed from any dressed poultry which is to be processed under inspection in an official establishment, except at the time of evisceration and inspection. Each carcass to be eviscerated shall be opened so as to expose the organs and the body cavity for proper examination by the inspector and shall be prepared immediately after inspection as ready-to-cook poultry."

Sec. 81.95, at the time these turkeys were processed at Springdale, provided:

"(a) No poultry or poultry product may be brought into an official establishment unless it has been prepared and inspected and passed in accordance with the regulations in this part, and not otherwise prepared, and the container of such product is marked so as to identify the article as so inspected and passed, in accordance with § 81.130. * * * All poultry, poultry products, meat and meat food products shall be reinspected by an inspector at the time they are brought into the official establishment." [1]

Plaintiff and defendant have each offered testimony and evidence of what took place in their plants. The testimony and evidence offered by Springdale Farms relates entirely to the processing of the turkeys by it and its delivery to Frez-N-Stor, while the testimony and evidence offered by Campbell Soup deals only with the procedure followed after the turkeys reached Sumter. The burden of proof is on the plaintiff to show that Springdale Farms breached the written agreement between it and Campbell Soup, or that Springdale Farms breached a common-law duty imposed by said contract and the provisions of the Poultry Products Inspection Act.

[1]. This regulation was amended October 31, 1971, and now provides:

"In processing plants, incoming poultry lots shall be routinely inspected for condition only, including possible transit contamination. Ordinarily such incoming poultry lots will not be reinspected for compliance with ready to cook requirements."

Prior to the revision of § 81.95 on October 31, 1971, § 81.7 was modified to provide that poultry products processed in official slaughter and eviscerating plants operating pursuant to the Poultry Products Inspection Act and bearing the official mark of inspection or other official identification may be received in further processing plants for utilization for manufacture of poultry products. Upon entering the official plant these shall be reinspected to insure that they are properly labeled, sound and wholesome.

The following shall constitute the findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

The turkeys involved in this action were the property of Campbell Soup (plaintiff or Campbell) throughout the processing. The turkeys were grown by individual growers for Campbell and processed by Springdale Farms (defendant or Springdale) pursuant to the aforementioned contract of April 16, 1969. Springdale received the live turkeys at its plant, and an ante mortem inspection was performed by U.S.D.A. inspectors as required by 21 U.S.C.A. § 455(a), after which the turkeys were put on an evisceration line where they were killed and then eviscerated. At a point on the evisceration line where the viscera had been drawn out of the body of the turkey, a post mortem inspection was performed by a U.S.D.A. inspector on each bird in accordance with the statute, 21 U.S.C.A. § 455(b), previously referred to. After the post mortem inspection, the various sections of the viscera were removed and each turkey was then checked by a house checker who was an employee of Springdale. Oneda Neal was the house checker at Springdale during the time the turkeys in question were processed, and whenever contamination was noted on a turkey, she would take it off the line and lay it back for further processing.

Mrs. Nellie Rouse was an employee of Campbell assigned to the Springdale plant who checked the turkeys at various points along the evisceration line. She noted problems in the Springdale plant with feathers and improper removal of the lungs from the turkeys from time to time, but never noted any contamination of the turkeys. Mrs. Rouse inspected approximately 100 turkeys per day.

At this point the turkeys were checked by a U.S.D.A. grader who graded these particular turkeys according to Campbell's specifications. He was assisted by a Springdale employee, and he testified that no turkeys passed through the grading area with crop dirt or fecal material

present. The turkeys were then put into storage tanks and packed in ice with water flowing through it. Dr. E. P. Deines, U.S.D.A. inspector in charge at the Springdale plant, took a random sample of approximately 100 turkeys from these tanks per day and found no contamination. He also checked the turkeys at various times on the evisceration line.

After the turkeys were processed, they were sent to "Demand Foods" where they were inspected again by Vernon Dillard, a U.S.D.A. inspector, who checked random samples of the turkeys before they were put in cold storage. He checked for crop dirt and the presence of fecal material, and any turkeys which were not in "good shape" were rejected at this point.

Then some of the turkeys were sent by Campbell to its plants in Worthington, Minn., and Omaha, Nebraska, and some of the turkeys were put into cold storage to be shipped to Sumter, S.C., as needed. The turkeys which were put into cold storage were stored at "Frez-N-Stor." Immediately prior to the time the turkeys were sent to Sumter, they were removed from the freezing tanks and placed in polyethylene bags and packed two or three turkeys to a box for shipment to Sumter. Upon arrival at Sumter the shipments were given a general inspection to check for shipment damage, and none was noted. As Campbell required these turkeys, it employed Willis Shaw Frozen Express to obtain them from the cold storage and deliver them to the Sumter plant. Upon arrival there they were placed in cold storage until further processing. Prior to further processing, a random sample of each lot of turkeys was removed by Campbell employees and placed into a thawing area with chiller tanks. Turkeys were classified by processors and placed in the chilling tanks, and U.S.D.A. inspectors reinspected the turkeys in these samples as provided in 7 C.F.R., § 81.95, supra. Upon reinspection at the Sumter plant, the U.S.D.A. inspectors testified they found fecal material, crop dirt, paint and

other contaminants on the turkeys. Campbell was notified of the presence of contaminants in the turkeys and given the option of reworking them in their plant or sending them back to the processing plant. It was decided to rework the turkeys and trim off as much of the uncontaminated meat as possible in order to utilize the turkeys for their intended use, TV dinners. When the turkeys had been reworked and trimmed, 184,328 pounds were found unfit for human consumption by the inspectors at Sumter. These parts consisted mainly of backs, skeletons and neck skins which are used for soup stock and feed material. Springdale was not notified of the administrative condemnation at Sumter since the turkeys were the property of Campbell.

Springdale had processed turkeys for Campbell for two years prior to 1969. The turkeys involved in this action were processed during the months of September, October and November of 1969. They were further processed by Campbell in Sumter from December 1969 through May 1970. Springdale processed a total of 3,718,722 pounds of turkeys for Campbell, of which approximately 1,880,000 pounds were sent to Sumter.

The first and primary contention of the plaintiff is that Springdale did not comply with the provision that provides:

"Only first class workmanship and material will be accepted, subject to the inspection and approval of our quality control department * * *. All turkeys will be made ready to cook in the judgment of our inspector."

When the evisceration processes were completed under the inspection of U.S.D.A. inspectors in the Springdale plant and the Campbell employee, Mrs. Rouse, the turkeys were first sent to Demand Foods where another U.S.D.A. inspector approved the processing. Springdale fully complied with its contract. Campbell had full knowledge of all the facts and precisely how the turkeys had been processed at Springdale.

It must be remembered that at all times throughout this transaction the turkeys were the property of Campbell. The turkeys were obviously properly processed since the evidence establishes that the other turkeys processed at the same time and in the same lots were sent to other Campbell plants, and no complaint of any kind was made by Campbell.

There is a total lack of proof of any actions on the part of the Springdale employees which would constitute less than first-class workmanship or justify the rejection by the quality control department of Campbell of any of the turkeys as now claimed by Campbell. In addition to this, the fact that Campbell's inspector at the Springdale plant, Nellie Rouse, did not reject any of the turkeys processed at Springdale as being not ready to cook is almost in and of itself controlling on this issue. To hold otherwise would be contrary to the terms of the contract since the turkeys as processed by Springdale were inspected and accepted by both U.S.D.A. inspectors and Campbell's inspector.

The second contention of Campbell is that Springdale failed to process the turkeys in compliance with the Poultry Products Inspection Act and applicable regulations, and thus failed to discharge the common-law duty to perform the services provided for in the contract with reasonable care, skill and diligence.

The alleged failure of Springdale to process the turkeys in compliance with the Poultry Products Inspection Act is a question that must be answered by consideration of the Act and applicable regulations. It has been previously stated that there are three inspections provided for in the Act. First, there is an ante mortem inspection which is made by checking a large group of live birds for signs of disease and other defects; second, the post mortem inspection which is an inspection of each individual carcass by a U.S.D.A. inspector; and third, a reinspection which is made from random samples of the carcasses. There

is no dispute that the turkeys were subject to continuous U.S.D.A. inspection throughout the processing.[2] The most thorough inspection is the post mortem inspection, and this inspection was performed at Springdale by U.S.D.A. inspectors as the turkeys were being processed. Each of the carcasses which were condemned at Sumter had previously passed a post mortem inspection at Springdale by U.S.D.A. inspectors. The court must give the greater weight to the post mortem inspection since it was performed on all of the carcasses and is a more thorough and deliberate inspection than any of the other inspections. A reinspection in this case was the sampling of approximately 25 turkeys which were selected from a random sample of turkeys taken from cold storage in the Sumter Campbell plant. The fact that the turkeys were administratively condemned pursuant to 21 U.S.C.A., § 455(c), at the reinspection level is not sufficient in and of itself to allow Campbell to recover damages from Springdale based on the allegation that Springdale violated a common-law duty under the contract with Campbell by processing turkeys which were not in compliance with the Act.

■■ The only proof offered by the plaintiff to support both of its contentions is that the turkeys processed by Springdale failed to pass a reinspection at Campbell's Sumter plant. This fact alone is not sufficient to show a breach of the terms of the contract between Campbell and Springdale nor any breach of a common-law duty implied by the existence of the regulations under the Poultry Products Inspection Act. Springdale processed the turkeys in a manner that was satisfactory to the U.S.D.A. inspectors and grader, the plaintiff's inspector, and Mrs. Oneda Neal, an inspector of many years experience, in the Springdale plant. Certainly it satisfied any common-law duty to exercise reasonable care, skill and diligence since a party cannot be asked to correct any fault which it is unaware of or could not have discovered with reasonable diligence. The testimony of each of the inspectors, when considered cumulatively, results in the conclusion that the standard for determining the amount of contamination which would have to be present before a turkey is condemned is not an objective standard. Without question, it was established that one inspector could come to an entirely different conclusion than another in looking at the same turkey as to whether or not there was sufficient contamination present to justify rejection of the turkey even though both inspectors followed the standards set out in the Poultry Inspector's Handbook (Plt. Ex. 69).

The plaintiff has not attacked in any manner the qualifications of the inspectors at Springdale or the manner in which the turkeys were processed and the various inspections made at Springdale. Thus, to entitle the plaintiff to recover, the court must find that the turkeys were improperly processed at Springdale and must accept the evidence of the witnesses from Sumter who admittedly made only a very limited inspection. No fact appears that would justify the court in rejecting the evidence adduced by the defendant even though some inspectors at Sumter purportedly did not agree with the inspectors at Springdale who were of equal ability and operating under the identical authority as those at Sumter.

After a careful consideration of all the evidence, the court is of the opinion that

---

2. Plaintiff's answers to defendant's request for admission of facts Nos. 9 and 10 are as follows:
   "Request No. 9: That the turkeys which are the subject matter of this lawsuit were processed under continuous United States Department of Agriculture inspection.
   "Answer to Request No. 9. Admit.
   "Request No. 10: That the United States Department of Agriculture did, during all times when such turkeys were being processed, have inspectors on the processing lines inspecting all such turkeys processed.
   "Answer to Request No. 10. Admit."

the plaintiff has not met the burden of proof resting upon it to establish its claims. It is not necessary for the court to speculate as to whether the inspectors at Sumter were better qualified and knew more about the business than other inspectors of equal rank at Springdale. The fact remains that every turkey was inspected not only once but at least three times [3] during the processing of the turkeys at Springdale, and only a casual inspection of a few turkeys were made at Sumter.

Plaintiff has devoted a considerable amount of its brief and reply brief to the issue of damages. However, since the court finds no liability on the part of the defendant for any damages Campbell might have suffered, it is not necessary to consider the issue of damages.

Therefore, the plaintiff is not entitled to recover and the complaint should be dismissed, and judgment is being entered today in accordance with the above dismissing the complaint of the plaintiff and awarding costs to the defendant.

---

3. Testimony reflected inspections by U.S.D.A., Campbell and Springdale at the Springdale plant.